**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Chief Judge Marcia S. Krieger**

Civil Action No. 15-cv-02263-MSK-KMT

KIMBERLY PREESON,

     Plaintiff,

v.

PARKVIEW MEDICAL CENTER, INC.;
LAURA HARRISON, individually and as Director of Admissions and Financial
Counseling of Parkview Medical Center, Inc.,

     Defendants.

---

**OPINION AND ORDER GRANTING IN PART AND DENYING IN PART
MOTIONS FOR SUMMARY JUDGMENT**

---

**THIS MATTER** comes before the Court on Defendants' Motions for Summary

Judgment (**# 48, 60**), Plaintiff's Reponses (**# 51, 61**), and Defendants' Replies (**# 53, 62**). Also

before the Court is Plaintiffs' Motion to Restrict (**# 52**) and Defendants' Response (**# 54**).

## JURISDICTION

The Plaintiff asserts claims under the Americans with Disabilities Act of 1990, 42 U.S.C.

§ 1210, *et seq.* ("ADA") and the Family and Medical Leave Act, 29 U.S.C. § 2601, *et seq.*

("FMLA"). The Court exercises jurisdiction over these claims pursuant to 28 U.S.C. § 1331. The

Court exercises jurisdiction over Plaintiff's related state law claim pursuant to 28 U.S.C. § 1367.

## FACTS

The Court offers a brief summary of the pertinent facts here and elaborates as necessary

in its analysis.  The parties disagree as to a number of facts and where facts are in dispute, this

recitation describes the facts taken in the light most favorable to Ms. Preeson.

### A.  Background

Ms. Preeson, was employed by defendant Parkview Medical Center ("Parkview") as a financial counselor/eligibility specialist from October of 2008 through December of 2014. Throughout her employment, Ms. Preeson suffered various health reversals, including cancer treatment and a diagnosis of Cyclic Vomiting Syndrome ("CVS"), which periodically causes her to experience multi-day bouts of nausea and vomiting.  Some of these health issues required her to take leaves of absence from work, all of which were approved by Parkview. Those leaves were generally designated as FMLA-approved, either contemporaneously or retroactively. By all appearances, Parkview regarded Ms. Preeson as an exemplary employee during this period.

In early 2013, Ms. Preeson prepared a grant proposal, seeking funds from Connect for Health Colorado ("C4H") to create a new Financial Counseling Department within Parkview. Ms. Preeson believed that, if the project was approved, she would be appointed to manage the new department.  Parkview's CEO, Mike Baxter, and its CFO, Bill Patterson, shared that belief and told Ms. Preeson so.  The grant request was partially successful: Parkview was accepted to participate in the program, but C4H did not award Parkview any funds.  Nevertheless, Parkview proceeded with plans to create the department.

In June 2013, Ms. Harrison was hired by Parkview as its Director of Admissions and Financial Counseling.  Ms. Harrison thus became Ms. Preeson's indirect supervisor – that is, she supervised Ms. Preeson's supervisor(s).  In July 2013, Ms. Harrison complimented Ms. Preeson's knowledge and experience and the "passion you have for your work"

### B.  Absenteeism incident

On September 30, 2013, Ms. Preeson was injured in a car accident. The next day, she called Ms. Harrison to let her know that she would be requesting FMLA leave to recover.  Ms.

Preeson's leave was approved by Parkview, and she remained out on leave until October 14, 2013.  On October 16, 2013, two days after Ms. Preeson returned to work, Ms. Harrison presented Ms. Preeson with a list showing her absences from work dating back to 2012.  It is undisputed that Ms. Preeson's total number of absences and tardy arrivals over the previous 12 months had exceeded the number permitted under Parkview's attendance policy, potentially exposing her to disciplinary action.  Ms. Harrison told Ms. Preeson that if she could not justify each absence, she would be terminated.  Ms. Preeson informed Ms. Harrison that some of the absences had related to medical issues and could be covered under the FMLA, and it appears that there was some discussion between the women as to whether Ms. Preeson had already been approved by Parkview to take intermittent FMLA leave during the period at issue and whether FMLA approval for a leave could be sought retroactively.  Ms. Harrison demanded to see Ms. Preeson's medical records, and Mr. Preeson agreed to obtain them.

The following day, Ms. Preeson informed Ms. Harrison that she had spoken to her doctor and to an attorney and that she believed that some of the absences would be covered by a request for retroactive FMLA leave.  Ms. Harrison confirmed with Parkview's Human Resources department that Ms. Preeson had applied for FMLA leave for those absences and been approved. Thereafter, Ms. Harrison wrote to Ms. Preeson stating "[e]ven though I do not have documentation as to why you were absent each time, if it falls within the intermittent FMLA time period [that Ms. Preeson had requested approval for], I am more than willing to excuse that absence if it was documented at the time."  Ms. Harrison did not pursue any further discipline Ms. Preeson and did not inquire about her absences again.

In October 2013, Ms. Preeson had a testy exchange with Ms. Harrison over an incident involving the assignment of new office space.  Ms. Preeson had complained to Ms. Harrison

about an issue, and Ms. Harrison later conveyed that conversation to one of Ms. Preeson's co-workers.  After the co-worker confronted Ms. Presson about the complaint, Ms. Preeson sent an e-mail to Ms. Harrison, stating that she was upset by Ms. Harrison failing to treat the complaint as confidential.  Ms. Harrison responded in writing that there was no time "for this sort of squabbling." The following day, Ms. Harrison summoned Ms. Preeson into her office and "screamed at [her]," telling her to "never send an e-mail reprimanding her again."  Ms. Preeson contacted Darrin Smith, Parkview's Vice President of Human Resources, asking for a meeting to discuss her issues with Ms. Harrison.  Ms. Preeson told Mr. Smith about her concerns that Ms. Harrison was being hostile and aggressive towards her, that she thought Ms. Harrison was looking for a reason to terminate her and deprive her of a promotion to head the newly-created Financial Counseling Unit, and that she believed that Ms. Harrison "had not treated me in the manner that she did prior to be taking FMLA leave and prior to [her] finding out that I had health issues associated with cancer and nausea and vomiting."  Mr. Smith assured Ms. Preeson that her job was not in jeopardy and that Ms. Harrison was not authorized to discipline her for absences that occurred in 2012.

### C.  Supervisor promotion

In or about November 2013, Parkview posted an opening for a supervisor[1] position in the Financial Counseling Department – the unit that Ms. Preeson's C4H grant proposal created and

---

[1]     There is a lack of clarity in the record as to the precise nature of what position(s) were made available and when.  It is clear that Parkview created an opening for a "supervisor" in the Financial Counseling Unit, and, as explained, eventually selected Ms. Caldera for that position. There is some indication that, at one point, Parkview was planning to hire a "lead employee" for the Unit, but as best the Court can tell, such a position was never created and the duties of that "lead employee" eventually became the duties of the supervisor position.

In addition, Ms. Preeson argues that she applied for but was rejected from a position as "Administrator" of the Unit, or perhaps some subset of it that related to the C4H proposal.  As

that Parkview's executives had previously suggested she should receive.  Ms. Preeson and her co-worker, Nadia Caldera, both applied for the position. Ms. Harrison and another supervisor, Lori Thomason, interviewed both Ms. Preeson and Ms. Caldera.  Ms. Harrison also spoke to third parties to get their opinions about the two candidates.  Ms. Harrison contends that two of these individuals, Julie Drake and Brenda LaCombe, spoke negatively about Ms. Preeson's work, but complimented Ms. Caldera.  (As discussed in greater detail below, Ms. Preeson disputes that the women stated these things to Ms. Harrison and accuses Ms. Harrison of fabricating Ms. LaCombe's comments.)  On or about November 14, 2013, Ms. Harrison selected Ms. Caldera for the position.  .

Ms. Caldera thus became Ms. Preeson's supervisor.  At that time, Ms. Harrison instructed Ms. Caldera to "keep specific documentation on people that were difficult," including Ms. Preeson.  Ms. Caldera testified that she understood that Ms. Harrison "was asking [her] to find ways to get rid of Ms. Preeson."  Ms. Caldera testified that Ms. Harrison stated that Ms. Preeson's requests for FMLA leave were "a bunch of baloney."  Ms. Caldera described Ms. Harrison as being particularly intolerant of employee absences and tardiness and that if someone complains about her, "they're going to get fired."

The record does not address any particular issues occurring between the end of 2013 and November 2014.  However, in early November 2014, Ms. Preeson was absent for several days due to an episode of CVS.  She sought and was approved to use FMLA leave for that absence.

**D.  Termination**

On December 16, 2014, Ms. Preeson arrived at Parkview at approximately 6:50 a.m. for her 7:00 a.m. shift.  She temporarily parked in a patient parking area near the front of the

---

discussed below, the record fails to establish any meaningful facts about the Administrator position.

building, intending to bring Christmas decorations in from her car.  She clocked in at 6:54 a.m., unloaded the Christmas decorations, and encountered a patient with whom she had a 7:00 a.m. appointment.  She told the patient that she had had a busy morning, that she had just returned from dropping her son off at school, that she had to go move her car to an employee parking area, and she would return shortly for the appointment.  The patient told her to take her time and that he wanted to go run an errand.  Ms. Preeson moved her car to the employee parking area, and on her way back to Parkview, experienced a wave of nausea.  She went to a restroom nearby (away from her regular work area) to take medication and wait out the episode.  She returned to Parkview's lobby at approximately 7:10 a.m., finding the patient there.  (She states that it appeared the patient had just arrived, having gone to a nearby supermarket to purchase pastries for the Parkview staff.)   She then completed her appointment with the patient.

The following day, Ms. Harrison summoned Ms. Preeson to a meeting with her and Christine Velasco, a Human Resources Manager.  At the meeting, Ms. Harrison relayed a significantly different version of the previous day's events.  Ms. Harrison stated that Judy Drake, Parkview's receptionist, encountered the patient in the lobby at or around 7:20 a.m.  The patient reported to Ms. Drake that he was here for a 7:00 a.m. appointment with Ms. Preeson, and that Ms. Preeson had told the patient that she was leaving to take her son to school.  Ms. Preeson explained to Ms. Harrison that the patient must have been confused and explained her version of events, beginning with moving the Christmas decorations.  Ms. Velasco then told Ms. Preeson that clocking in, and <u>then</u> taking the decorations out of her car and moving her car while on the clock, constituted the prohibited act of leaving the premises during work hours. Ms. Preeson protested that employees leaving the building during work hours to move their cars (and to go to Starbucks, to the bank, to fast food restaurants, to stores for sales, and so on) was a practice that

was well-known and approved of by Ms. Caldera.  She noted that she was aware that both Ms.

Caldera and Ms. Harrison themselves would leave during work hours to move their cars and that

she had once complained to Ms. Harrison directly that Ms. Caldera was leaving during work

hours to get a pedicure, an action that did not result in action by Ms. Harrison.  Ms. Preeson

again stated that her delay in arriving was due to her nausea.

Ms. Velasco stated that she would look into the matter and placed Ms. Preeson on

administrative leave.  Ms. Velasco then contacted the patient, who repeated his understanding

that Ms. Preeson had left to take her son to school, and she also took a statement from Ms.

Drake.  Ms. Harrison and Ms. Velasco presented this information to Mr. Smith.  Mr. Smith

determined that Ms. Preeson should be terminated for falsification of time.  He stated that even if

he had believed her explanation of the events, he still would have terminated her for the

alternative reason that she left to go move her car after clocking in.

Ms. Preeson filed a charge of discrimination with the EEOC, [2] and, after obtaining a

Right to Sue Notice, commenced this action.  In her Amended Complaint, Ms. Preeson asserts

eight claims for relief: six of which are brought against Parkview: (i) interference with FMLA

rights, arising from several different events; (ii) retaliation for exercise of FMLA rights, based o

her non-selection for the supervisor position and her termination; (iii) retaliation for the exercise

of rights under the ADA; (iv) discrimination on the basis of disability (cancer) in violation of the

ADA; (v) discrimination on the basis of disability (CVS) in violation of the ADA; (vi)

discrimination in violation of the Colorado Anti-Discrimination Act ("CADA"); and two claims

---

[2]      Ms. Preeson's FMLA claims are, in part, supported by discrete acts not addressed in her
EEOC charge. However, FMLA claims are not subject to the exhaustion requirement of
discrimination claims asserted under Title VII and parallel employment discrimination statutes.
*See Jacobsen v. Bank of Denver*, Case No. 14-cv-03441-REB-MJW, 2015 WL 3576502, *4 (D.
Colo. June 8, 2015).

that she brings against Ms. Harrison personally: (vii) discrimination in violation of CADA; and (viii) libel *per se*, arising from Ms. Harrison falsely claiming that Ms. LaCombe gave negative references for Ms. Preeson.

Both Parkview and Ms. Harrison move for summary judgment in their favor on all claims. In the course of briefing that motion, Ms. Preeson agreed with withdraw both of her claims under CADA and her claim for ADA retaliation.

## ANALYSIS

### A. Standard of Review

Rule 56 of the Federal Rules of Civil Procedure facilitates the entry of a judgment only if no trial is necessary. *See White v. York Intern. Corp.*, 45 F.3d 357, 360 (10th Cir. 1995). A trial is required if there are material factual disputes to resolve. As a result, entry of summary judgment is authorized only "when there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Savant Homes, Inc. v. Collins*, 809 F.3d 1133, 1137 (10th Cir. 2016). A fact is material if, under the substantive law, it is an essential element of the claim. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is genuine if the conflicting evidence would enable a rational trier of fact to resolve the dispute for either party. *Becker v. Bateman*, 709 F.3d 1019, 1022 (10th Cir. 2013).

The consideration of a summary judgment motion requires the Court to focus on the asserted claims and defenses, their legal elements, and which party has the burden of proof. Substantive law specifies the elements that must be proven for a given claim or defense, sets the standard of proof, and identifies the party with the burden of proof. *See Anderson*, 477 U.S. at 248; *Kaiser-Francis Oil Co. v. Producer's Gas Co.*, 870 F.2d 563, 565 (10th Cir. 1989). As to the evidence offered during summary judgment, the Court views it the light most favorable to the

non-moving party, thereby favoring the right to trial. *See Tabor v. Hilti, Inc.*, 703 F.3d 1206, 1215 (10th Cir. 2013).

Motions for summary judgment generally arise in one of two contexts – when the movant has the burden of proof and when the non-movant has the burden of proof. Each context is handled differently. When the movant has the burden of proof, the movant must come forward with sufficient, competent evidence to establish each element of its claim or defense. *See* Fed. R. Civ. P. 56(c)(1)(A). Presumably, in the absence of contrary evidence, this showing would entitle the movant to judgment as a matter of law. However, if the responding party presents contrary evidence to establish a genuine dispute as to any material fact, a trial is required and the motion must be denied. *See Leone v. Owsley*, 810 F.3d 1149, 1153 (10th Cir. 2015); *Schneider v. City of Grand Junction Police Dep't*, 717 F.3d 760, 767 (10th Cir. 2013).

A different circumstance arises when the movant does not have the burden of proof. In this circumstance, the movant contends that the non-movant lacks sufficient evidence to establish a *prima facie* case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). The moving party must identify why the respondent cannot make a *prima facie* showing; that is, why the evidence in the record shows that the respondent cannot establish a particular element. *See Collins*, 809 F.3d at 1137. If the respondent comes forward with sufficient competent evidence to establish a *prima facie* claim or defense, then a trial is required. Conversely, if the respondent's evidence is inadequate to establish a *prima facie* claim or defense, then no factual determination of that claim or defense is required and summary may enter. *See Shero v. City of Grove, Okla.*, 510 F.3d 1196, 1200 (10th Cir. 2007).

### B. Employment Claims

Parkview and Ms. Harrison jointly seek summary judgment on Ms. Preeson's claims for FMLA interference, FMLA retaliation, and two claims of discrimination under the ADA.

       1.  <u>FMLA claims</u>

The FMLA requires that employers permit eligible employees to take up to twelve weeks of leave per year if needed because of a serious health condition. *See* 29 U.S.C. § 2612(a)(1)(D). If an employer either interferes with or retaliates against an employee in conjunction with FMLA rights, an employee may seek relief. *See* 29 U.S.C. § 2612(a).

As an initial matter, Parkview contends that much of Ms. Preeson's FMLA <u>interference</u> claim is properly brought as an FMLA <u>retaliation</u> claim. Interference and retaliation claims are distinct. *Metzler v. Fed. Home Loan Bank of Topeka*, 464 F.3d 1164, 1170-71 (10th Cir. 2006). A claim for interference is premised upon § 2615(a)(1): '[i]t shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided in this subchapter.'" *Smith v. Diffee Ford-Lincoln-Mercury, Inc.*, 298 F.3d 955, 960 (10th Cir. 2002). A retaliation claim is grounded in § 2615(a)(2): "[i]t shall be unlawful for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by this subchapter.'" *Id.*

       (a)  <u>Interference</u>

To prove FMLA interference under 29 U.S.C. § 2615(a)(1), a plaintiff must show: (i) she was eligible to take FMLA leave; (ii) that an adverse action by her employer interfered with her ability to take that leave; and (iii) that the employer's action was related to the exercise or attempted exercise of the employee's FMLA rights. *Id.*; *Jones v. Denver Pub. Schools*, 427 F.3d 1315, 1318-19 (10th Cir. 2005). An FMLA interference claim is unlike a retaliation claim, in that the employer's motivation is irrelevant in the interference context. *See Metzler*, 464 at 1170; *see*

*also Mellen v. Trustees of Boston Univ.*, 504 F.3d 21, 26 (1st Cir. 2007).  Typically then, an interference claim arises when an employer takes an adverse employment action against an employee before the employee is allowed to take FMLA leave, while the employee is on leave, or in a way that effectively prevents the employee from resuming work after returning from leave. *Id.*; *Randazzo v. CH2M Hill, Inc.*, Case. No. 13-cv-03276-MSK-KLM, 2014 WL 4697131, *6 (D. Colo. Sept. 22, 2014); *Campbell v. Gambro Healthcare, Inc.*, 478 F.3d 1282 (10th Cir. 2007) (an interference claim could be maintained where an employee was not terminated until he returned from FMLA, where employer had made the decision to terminate while he was on leave).

Ms. Preeson's interference claim asserts that she was subjected to four adverse actions relating to her leave: (i) Ms. Harrison "harassed" her about her attendance when she returned from her October 2013 leave; (ii) she was denied a position as Administrator for the C4H project; (iii) she was excluded from a training course relating to the C4H project; and 4) she was not given the supervisor position in Parkview's Financial Counseling Department.  The latter three of these actions are problematic on their face, in that they have no apparent connection to her requesting, using, or returning from FMLA leave; all of the adverse events arose some length of time after she returned from her leave.  Rather, Ms. Preeson's theory seems to be that Parkview took these actions against her because she had taken FMLA leave in the past. Parkview thus argues that these actions are properly asserted as FMLA retaliation claims instead. Because retaliation and interference claims require different showings, the Court will begin with whether any of Ms. Preeson's four adverse actions are sufficient to support an interference claim.

In *Dalpiaz v. Carbon Cnty., Utah,* 760 F.3d 1126, 1132 (10th Cir. 2014), the Circuit recognized that an employee "must show that she was prevented from taking the full 12 weeks of

leave guaranteed by the FMLA, denied reinstatement following leave, or denied initial permission to take leave" or otherwise chilled from initially seeking FMLA benefits. *See also See, e.g., Coleman v. Blue Cross Blue Shield of Kansas*, 487 F.Supp.2d 1225, 1244 (D. Kan. 2007), *aff'd by* 287 F.3d. App'x 631 (10th Cir. July 8, 2008) (finding that an interference claim must be based on denying, discouraging, or otherwise interfering with FMLA rights). Thus, it would appear that interference claims must have some direct nexus to an employee requesting, using, or returning from leave.[3] Ms. Preeson's argument that an interference claim can lie when an employer takes an adverse action long after an employee has returned from leave would, in many respects, eliminate the need for a separate prohibition against retaliation, rendering 29 U.S.C. § 2615(a)(2) superfluous. Courts must construe statutory language in a manner that gives effect and meaning to each word or provision included by Congress. *Reiter v. Sonotone Corp.*, 442 U.S. 330, 339 (1979); *Negonsott v. Samuels*, 933 F.2d 818, 819 (10th Cir. 1991). Thus, the Court concludes that all but Ms. Preeson's claims based on Ms. Harrison threatening to fire her for absenteeism immediately upon returning from FMLA leave in October 2013 fail to articulate cognizable interference claims.

That is not to say, however, that FMLA interference claims are as limited as Parkview suggests. A plaintiff need not show that her employer outright denied her FMLA leave or prevented her from invoking it. Rather, she must only show that it provided a strong disincentive or discouraged use of available FMLA leave, such that would cause her to fear invoking her

---

[3]      Ms. Preeson's reliance on the Department of Labor's regulations is misplaced. Title 29 C.F.R. § 825.220 may seem to suggest that interference claims are broadly cognizable, but the regulation pertains to both claims for interference <u>and</u> for discrimination/ retaliation. *Bachelder v. America West Airlines, Inc.*, 259 F.3d 1112, 1124 (9th Cir. 2001) ("29 C.F.R. § 825.220 implements all parts of 29 U.S.C. § 2615"); *see Strickland v. United Parcel Serv., Inc.*, 555 F.3d 1224, 1227 (10th Cir. 2009) (29 C.F.R. § 825.220 pertains to 29 U.S.C. § 2615, which includes both interference and discrimination/retaliation).

rights under the FMLA. *See, e.g., Xin Liu v. Amway Corp.*, 347 F.3d 1125, 1133-34 (9th Cir. 2003); *Coleman*, 487 F.Supp.2d at 1244.  Often, this comes down to the timing of any adverse action. *See Campbell v. Gambro Healthcare, Inc.*, 478 F.3d 1282 (10th Cir. 2007) ("the two claims differ with respect to the timing of the adverse action"). Only one of Ms. Preeson's bases for interference conceivably meets this requirement: that when Ms. Preeson attempted took FMLA leave in October 2013, she was harassed and threatened with termination by Ms. Harrison immediately upon her return, and the Court thus proceeds to consider only this claim.

Parkview contends that Ms. Preeson cannot show that its actions interfered with her right to take FMLA leave. In response, Ms. Preeson has come forward with evidence that on October 1, 2013, Ms. Preeson informed Ms. Harrison she needed to apply for FMLA leave as a result of her auto accident. A few hours later, Ms. Harrison asked another employee to generate an attendance sheet for Ms. Preeson, and using her attendance record, Ms. Harrison drafted a "verbal disciplinary action," intending to discipline her for absenteeism.  On October 13, 2013, employee relations notified Ms. Harrison that Ms. Preeson was eligible for FMLA leave for her current absence, pending medical certification. On October 14, 2013, Ms. Preeson returned to work. On October 15, 2013, Ms. Preeson's FMLA leave was formally approved by employee relations. On October 16, 2013, Ms. Harrison presented Ms. Preeson with the attendance sheet, and informed her that if she was unable to explain her past absences, she would be terminated. Ms. Harrison later reiterated this warning in an email to Ms. Preeson.

The Court cannot say that these events demonstrate that Parkview interfered with Ms. Preeson's ability to avail herself of her FMLA rights, then or in the future.  One could certainly criticize Ms. Harrison's diplomacy in beginning the discussion with a heavy-handed threat of termination, but the record also reflects that Ms. Harrison was correct: Ms. Preeson's cumulative

absences did exceed that permitted by Parkview's policies and that Ms. Preeson apparently had

not yet sought to have those absences designated as FMLA-eligible.  Similarly, Ms. Harrison's

broaching that subject within days of Ms. Preeson returning from leave might be abrupt or

insensitive, but it did not prevent Ms. Preeson from returning from her leave and resuming her

work, however briefly.  Most importantly, the ensuing discussion resulted in Ms. Preeson

retroactively clarifying the status of certain absences, bringing her into compliance with

Parkview's policy, and Ms. Harrison then dropped the subject without imposing any discipline.

Thus, Ms. Harrison's only true mistake was one of tone or timing, not substance.  The Court

cannot say that an FMLA interference claim can arise from a supervisor's mere brusque tone,

tone, particularly where the record reflects that it did not discourage the employee from taking

leave in the future.  Here, Ms. Preeson continued to invoke her FMLA rights, taking additional

leave again in November 2014.  Accordingly, the Court finds that Parkview is entitled to

summary judgment on Ms. Preeson's FMLA retaliation claim in its entirety.

(b) Retaliation

To establish a claim for FMLA retaliation, a plaintiff must show that: (i) she engaged in a

FMLA-protected activity; (ii) her employer took an action that a reasonable employee would

have found materially adverse; and (iii) there is some causal connection between the protected

activity and the adverse action. *Smothers v. Solvay Chemicals, Inc.*, 740 F.3d 530, 540 (10th Cir.

2014); *see also Janczak v. Tulsa Winch, Inc.*, 621 Fed. App'x 528, 534 (10th Cir. July 30, 2015);

*Robert v. Bd. of Cnty. Comm'rs*, 691 F.3d 1211, 1219 n. 6 (10th Cir. 2012). The burden then

shifts to the employer to articulate a non-retaliatory for the adverse action, and the plaintiff bears

the ultimate burden of showing that reason to be a pretext for retaliation. *Doebele v.*

*Sprint/United Mgmt. Co.,* 342 F.3d 1117, 1135 (10th Cir. 2003).

Ms. Preeson based her FMLA retaliation claim on four different adverse actions: (i) she was denied the title of Administrator for the C4H projectin November of 2013; (ii) she was excluded from a training course in December 2013; (iii) she was not selected for the supervisor position that was given to Ms. Caldera; and (iv) she was terminated.

The Court construes 'adverse action' liberally. "It is not limited to actions that affect the terms and conditions of employment" or monetary losses. *Reinhardt v. Albuquerque Pub. Schs. Bd. of Educ.*, 595 F.3d 1126, 1133 (10th Cir. 2010). An employment action is sufficiently adverse for purposes of a retaliation claim if a reasonable employee would have found it materially adverse or, the employee would be dissuaded from engaging in protected conduct. *Burlington Northern & Santa Fe Ry. v. White*, 548 U.S. 53 (2005); *McGowan v. City of Eufala*, 472 F.3d 736, 742 (10th Cir. 2006). The Court focuses on materiality of the action – employer actions that are merely "petty slights, minor annoyances, or simple lack of good manners" do not suffice. *Burlington Northern*, 548 U.S. at 69-71; *see also Reinhardt*, 595 F.3d at 1133 (actions that carry a "risk of humiliation, damage to reputation, and a concomitant harm to future employment prospects may be considered adverse, but mere inconveniences or alteration of tasks are not). Actions are examined on a case-by-case basis, focusing on the context in which they occurred. *Id.*

Employer actions involving assignment of job duties may be materially adverse in certain circumstances. *Burlington Northern*, 548 U.S. at 71. If, for instance, an employee presents evidence that certain responsibilities and duties are objectively more or less desirable than others, assignment to the less desirable role may be sufficiently adverse. *See Semsroth v. City of Wichita*, 555 F.3d 1182, 1185 (10th Cir. 2009). Likewise, excluding an employee from a regular training lunch designed to contribute to employees' professional development and job

advancement could suffice. *See Unal v. Los Alamos Pub. Schs.*, 636 Fed App'x 729, 743 (10th Cir. Jan. 29, 2016) (*examining Burlington Northern*, 548 U.S. 53). But the emphasis is on materiality – is there evidence that the particular action diminishes future advancement prospects or negatively changes job duties.

The Court finds that neither the denial of the title of "Administrator" for the C4H project nor her exclusion from a training course constitute adverse employment actions. With regard to the Administrator issue, the record is scant.  It appears that the "Administrator" title was nothing more than the designation of a contact person at Parkview to receive e-mails that were sent from C4H – that is that the title in question was "Account Administrator."  In any event, the record reflects that Ms. Harrison ultimately decided to designate herself as Administrator on the project.[4]  Ms. Preeson can hardly complain that her superior elected to appropriate a title that Ms. Preeson desired.

In regard to Ms. Preeson's exclusion from a training course, the record reflects that on December 17, 2013, Ms. Harrison, Ms. Caldera, and Ms. Drake all attended a training program in conjunction with the C4H project.  Ms. Preeson contends that she was not notified of or invited to the event.  The Court need not dwell excessively on this issue, as Ms. Preeson offers no explanation of what the training entailed, why her attendance was warranted, or how the

---

[4]     The C4H project also required Parkview to designate someone to be responsible for "Internal Support E-Mail," and Parkview allocated this function to Ms. Caldera.  It is not clear whether Ms. Preeson contends that she should have been given this title as well, but in any event, the scant record on this point does not indicate that this title had any meaningful responsibilities besides receiving e-mails from C4H.  Ms. Preeson makes a passing comment that "arguably, the[ ] extra job duties" associated with having a title on the project "helped make Ms. Caldera . . . supervisor[ ] of the Financial Counseling Department."  Presumably, Ms. Preeson is contending that being designated as Internal Support E-Mail increased Ms. Caldera's chances of promotion to supervisor, but notably, Ms. Preeson does not cite to any evidence whatsoever that establishes that Ms. Caldera's work as Internal Support E-Mail factored into the decision to promote her to supervisor.

denial of such training could affect her employment or chill her willingness to invoke her rights under the FMLA.  Literally, the only description Ms. Preeson offers of the training event is that it was "relevant to my job."  In such circumstances, the Court finds that Ms. Preeson has not come forward with evidence that could demonstrate that the exclusion from the training event is an adverse employment action.  Accordingly the Court grants summary judgment to Parkview on Ms. Preeson's FMLA retaliation claims relating to these events.

The Court then turns to two events that are undeniably adverse employment actions: the selection of Ms. Caldera over Ms. Preeson for the supervisor position and Ms. Preeson's termination.  Parkview concedes that Ms. Preeson has establisled a *prima facie* case of retaliation as to these events.  However, it contends that it had legitimate, nondiscriminatory reasons for both denying her the promotion and for her termination, and that Ms. Preeson cannot show that these proffered reasons were pretext for FMLA retaliation.  As noted above, Parkview contends that it selected Ms. Caldera because she had better comments about her abilities from persons who worked with her, and terminated Ms. Preeson for falsification of time records.  These are facially non-retaliatory reasons, and thus, the Court turns to the question of whether Ms. Preeson can show that they are pretextual.

Pretext may be established by several means. *See Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1323 (10th Cir. 1997); *see also Conroy v. Vilsack*, 707 F.3d 1163, 1172 (10th Cir. 2013) ("[P]retext can be shown in a variety of ways," and "there is no one specific mode of evidence required to establish the . . . inference."). "[A] plaintiff demonstrates pretext by showing either that a [retaliatory] reason more likely motivated the employer or that the employer's proffered explanation is unworthy of credence." *Smothers v. Solvay Chemicals, Inc.,* 740 F.3d 530, 539 (10th Cir. 2014); *Zamora v. Elite Logistics, Inc.,* 478 F.3d 1160, 1166 (10th Cir.2007). A

plaintiff may point to "weaknesses, implausibilities, inconsistences, incoherencies, or contradictions" in the employer's reason that might cause a reasonable fact finding to find the reasons unbelievable. *Trujillo v. PacifiCorp,* 524 F.3d 1149, 1158 (10th Cir. 2008); *see also Oglesby v. Hy-Vee, Inc.*, 214 Fed App'x 829, 831-32 (10th Cir. Jan. 30, 2007). Or a plaintiff might offer some evidence that an employer's reason was false or that the employer acted contrary to written company policy or informal practices. *Kendrick v. Penske Transp. Serv., Inc.*, 220 F.3d 1220, 1230 (10th Cir. 2000). A plaintiff might also offer evidence that an employer "didn't really believe its proffered reasons action and thus may have been pursuing a discriminatory agenda." *DeWitt v. Southwestern Bell Telephone Co.*, 845 F.3d 1299, 1307 (10th Cir. 2017). Or, a 'failure to conduct what appeared to be a fair investigation of' the violation that purportedly prompted adverse action may support an inference of pretext." *Dewitt*, 845 F.3d at 1314. At the same time, the Court notes that it does not serve as a "super-personnel department," reviewing the employer's decision for correctness, wisdom, or even generalized fairness.  The operative question is not whether Parkview was correct or wise in believing Ms. Caldera to have superior qualifications for the supervisor position or in believing that Ms. Preeson should be terminated for time theft; the Court's only question is whether, at the time of the adverse action, Parkview did indeed genuinely believe those things. *Timmerman v. U.S. Bank, N.A.*, 483 F.3d 1106, 1119 (10th Cir. 2007) (*quoting Pastran v. K-Mart Corp.*, 210 F.3d 1201, 1206 (10th Cir. 2000)).

Turning first to the denial of the promotion, Ms. Preeson offers two types of evidence: evidence of Ms. Harrison's own animus against Ms. Preeson for having taken FMLA leave and evidence casting suspicion on Parkview's proffered reason for promoting Ms. Caldera. First, as discussed above, there is competent evidence suggesting that Ms. Harrison "target[ed] [Ms.

Preeson] after [she] took FMLA leave." Ms. Caldera's testified that Ms. Harrison "doesn't have patience for anyone [who] misses work for any reason." Ms. Caldera testified that Ms. Harrison complained about Ms. Preeson's FMLA leave, referring to it as "a bunch of baloney." A factfinder could also draw inferences about Ms. Harrison's animus through timing: Ms. Preeson seems to suggest that Ms. Harrison praised her work in July 2013, but that her attitude towards Ms. Preeson changed abruptly as soon as Ms. Preeson indicated in October 2013 that she needed to take FMLA leave for her auto accident.

The record also calls into question Parkview's primary reason for promoting Ms. Caldera.  Ms. Preeson testified that "[Ms.] Harrison . . . creat[ed] a fictitious reference" by Brenda LaCombe, expressing negative impressions of Ms. Preeson.  Ms. LaCombe testified that Ms. Harrison's description of her statements about Ms. Preeson were inaccurate. For example, contrary to the assertions in Ms. Harrison's notes, Ms. LaCombe denied calling Ms. Preeson's qualifications and experience "laughable"; denied stating that Ms. Preeson would find ways to get patients on Medicaid; denied observing that Ms. Preeson resented her colleagues; and denied stating that Ms. Preeson did not have a good reputation.  Ms. Harrison's notes reflect that she based her decision in part on these very comments.  Because there is a genuine dispute of fact as to whether Ms. LaCombe made these comments, there is also a dispute of fact as to whether Ms. Harrison could properly have relied upon them.

Based on this evidence, a reasonable fact finder could conclude that Defendants' proffered reason for not promoting Ms. Preeson – negative feedback from coworkers and, to a lesser extent, interview performance – was pretext for discrimination. Summary judgment is therefore not appropriate on the FMLA retaliation claim relating to the denial of a promotion to Ms. Preeson.

The analysis is slightly more complex with regard to Ms. Preeson's termination.  There is no question that Ms. Preeson has established a *prima facie* case of FMLA retaliation with regard to her termination, and Parkview has proffered one non-retaliatory reasons for her termination: falsification of time.[5]  Ms. Preeson has come forward with several types of evidence that would suggest that this explanation is pretextual.  Most significantly, she has shown that Ms. Harrison was involved in the decisionmaking process, and as noted above, Ms. Harrison has made comments that might reflect an animus against employees who take FMLA leave.  Also, Ms. Preeson has come forward with evidence that Parkview treated her differently from its policy or practice of allowing employees to leave work to perform a wide range of tasks, including moving cars, shopping, and getting a pedicure, all while clocked in.

Parkview argues that such evidence is insufficient to demonstrate pretext.  It emphasizes that Mr. Smith, not Ms. Harrison, was the ultimate decisionmaker with regard to Mr. Preeson's termination, and that Mr. Preeson has not alleged that Ms. Smith harbored any anti-FMLA animus. The record does not necessarily support the contention that Ms. Smith was the only decisionmaker: Ms. Harrison testified in her deposition that "together we decided that there should be a termination," suggesting that she participated in making the decision along with Mr. Smith.  Moreover, there is evidence that Mr. Smith did not engage in any investigation of his own, relying entirely on facts developed by Ms. Harrison and Ms. Velasco. Most notably, it does not appear that Mr. Smith considered (and perhaps was not even advised) that Parkview's supervisors, including Ms. Harrison, had allowed employees to leave the work premises while

---

[5]     Although Ms. Smith articulated two separate reasons for his decision to terminate Ms. Preeson – his belief that she left work to take her son to school while on the clock, and her admission to leaving work to move her car while on the clock – there is no meaningful difference between them.  Both explanations stem from the same proposition: that employees may not engage in non-work activities while clocked in.

clocked in on many occasions in the past.  In such circumstances, Ms. Preeson might also ultimately be able to prevail on a "cat's paw" theory: that Mr. Smith relied too much on Ms. Harrison's biased reporting and selection of the facts, such that his own lack of animus could be called into question.  *See Thomas v. Berry Plastics Corp.*, 803 F.3d 510, 514 (10th Cir. 2015).

Parkview also argues that instances in which other employees, including Ms. Caldera, left work to move cars or shop while on the clock are distinguishable.  In response to Ms. Preeson's contentions that Ms. Harrison and Ms. Caldera frequently left work to move their cars, Parkview contends that because they are exempt employees not subject to overtime rules, they are not required to punch into and out of work when leaving the premises.  Without opining as to whether this distinction is significant enough to conclude that Ms. Harrison and Ms. Caldera are not similarly-situated to Ms. Preeson in this regard, the Court finds that this argument does not refute (and indeed, partially confirms) Ms. Preeson's assertion that leaving the facility to move cars was a frequent practice among many Parkview employees, both exempt and non-exempt, and that this often occurred while employees were clocked in or otherwise on work time.  Moreover, whether this was a practice that only Ms. Caldera allowed to occur, contrary to Parkview policy and without her superiors' knowledge, is one that, along with the rest of the totality of the circumstances, is more properly considered by the factfinder.

Accordingly, the Court finds that Ms. Preeson has come forward with sufficient evidence to suggest that Parkview's justification for her termination could be a pretext for FMLA retaliation.  Her FMLA retaliation claim relating to Ms. Caldera's promotion and her own termination must proceed to trial.

2.  ADA discrimination (Cancer)

Next, the Court considers Ms. Preeson's claim that Parkview discriminated against her under the ADA because she suffered from the disability of having cancer. Ms. Preeson contends that Parkview "unlawfully denied her three separate promotion opportunities" because she was known to have had cancer. Parkview argues that Ms. Preeson failed to exhaust her administrative remedies as to this claim.

Exhaustion of administrative remedies is a prerequisite to bringing claims for employment discrimination under the ADA. *Shikles v. Sprint/United Mgmt. Co.*, 426 F.3d 1304, 1308-09 (10th Cir. 2005); *McBride v. CITGO Petroleum Corp.*, 281 F.3d 1099, 1105 (10th Cir. 2002). The burden to show exhaustion rests with the plaintiff. *McBride*, 281 F.3d at 1106. Proper exhaustion requires an employee plead sufficient facts in an EEOC charge to put an employer on notice of the claims against it, and to alert the EEOC of the particular claims and factual allegations needing investigation. *Martinez v. Potter*, 347 F.3d 1208, 1211 (10th Cir. 2003). All discrete discriminatory acts must be identified in the charge, including, for example, disciplinary action, failure to promote, or refusal of transfer. *Id.* at 1210-11. Therefore, an employee cannot request relief in litigation for actions that were not first identified in the EEOC charge. *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101 (2002); *Martinez*, 347 F.3d at 1210; *Annett v. Univ. of Kan.*, 371 F.3d 1233, 1238 (10th Cir. 2004).

In her EEOC charge, Ms. Preeson alleged that she had been "terminated without recourse" for "leaving the premises while on the clock."  She reported that a "co-worker" was upset with her and "retaliated against me by reporting that I had left the premises unauthorized." She states that "[b]ecause of my disability I have had to take time off for medical reasons. Although I was granted the time off, I believe that the company noticed that my condition was permanent and therefore, I would continue to need time off for my disability. The company used

my leaving [the premises] as a pretext to terminate my employment." More generally, she alleges that "the company negatively altered the terms and conditions of my employment."

Nothing in Ms. Preeson's EEOC charge lists denials of promotions as alleged adverse actions she suffered due to her having cancer, much less identify the position she sought, the date of the denial, and so on. Denial of a promotion is a discrete act, and because Ms. Preeson did not allege it in her EEOC charge, she has not exhausted her administrative remedies as to her Fourth Claim for ADA discrimination. Accordingly, the Court grants summary judgment in favor of Defendants on Ms. Preeson's claim for ADA discrimination based on denials of promotions.

### 3. ADA Discrimination (CVS)

Ms. Preeson asserts that her termination constituted discrimination on the basis of her having a disability, namely CVS.

The ADA prohibits employers from discriminating against a qualified employee on the basis of disability. 42 U.S.C. § 12112; *Morgan*, 108 F.3d at 1323. ADA discrimination claims are analyzed under the *McDonnell Douglas* framework explained above. *Williams v. Widnall*, 79 F.3d 1003, 1005 (10th Cir. 1996). To establish a *prima facie* case for ADA discrimination, a plaintiff must show that: (i) she is disabled within the meaning of the statute; (ii) she is qualified for the job with or without reasonable accommodation; and (iii) her employer terminated her under circumstances giving rise to an inference that termination was based on the plaintiff's disability. *Morgan*, 108 F.3d at 1323.

Parkview does not dispute that Ms. Preeson's CVS condition could constitute a disability under the ADA. However, it argues that Ms. Preeson cannot establish the third element of an ADA discrimination claim – circumstances giving rise to an inference of discrimination – because she cannot show that any of the people involved in the decision to terminate her were

even aware of her condition.  It appears to be undisputed that Ms. Preeson was not formally diagnosed with CVS until November 2014, just prior to her termination, and that she did not specifically inform Ms. Harrison, Ms. Velasco, or Mr. Smith of that diagnosis prior to her termination.  However, Ms. Preeson argues that Ms. Harrison, at a minimum, knew that Ms. Preeson suffered from frequent nausea and vomiting episodes, had been approved for FMLA leave for them, and had taken leave for that problem in the previous month, even if the specific diagnosis of that condition remained elusive.  In explaining to Ms. Velasco why she was late in returning to work on December 14, Ms. Preeson stated that she had suffered an episode of nausea and needed to stop in a restroom and take medication for it.  Knowledge that Ms. Preeson was suffering from a condition that was apparently medication controlled could be said to have put Ms. Harrison and Ms. Velasco on notice of the possibility that Ms. Preeson's condition was something more serious than a single incident, again suggesting that it might arise to the level of a disability.  Given the minimal burden imposed on employees at the *prima facie* case stage, the Court finds these facts could be sufficient to indicate Parkview's knowledge of the disabling symptoms of Ms. Preeson's CVS, even if Parkview did not know of the specific diagnosis. Thus, Ms. Preeson has shown that she can establish a *prima facie* case of disability discrimination.

As noted above, Parkview has tendered a non-discriminatory reason for Ms. Preeson's termination: falsification of her time records.  Thus, the Court turns to the question of pretext. For essentially the same reasons discussed above, the Court finds that Ms. Preeson has made a colorable showing that Parkview's reason for her termination is a pretext for disability discrimination.  Ms. Harrison's comments declaring Ms. Preeson's need to take FMLA leave for medical needs as being "baloney" are equally probative of an animus towards Ms. Preeson

needing to take time off from work due to her disability.  And, as discussed previously, Ms.

Preeson has come forward with evidence to suggest that other employees, presumably including

non-disabled ones (like Ms. Caldera and Ms. Harrison) were not punished for leaving the

premises during work hours.  Accordingly, the Court finds that Ms. Preeson's ADA claim based

on her termination must proceed to trial.

Accordingly, the Court grants in part and denies in part the Defendants' motion for

summary judgment.  Ms. Preeson's claims for FMLA retaliation (relating to denial of the

promotion to supervisor and to her termination), and ADA discrimination (relating to her

termination) will proceed to trial.

### C.  Defamation claim

Ms. Harrison separately moves for summary judgment on Ms. Preeson's claim for libel

*per se*.  Specificaly, Ms. Preeson alleges that Ms. Harrison fabricated negative comments about

Ms. Preeson's work, attributed them to Ms. LaCombe, put them in writing, and published them

by e-mailing them to two officials at Parkview to justify her selection of Ms. Caldera as

supervisor.

Defamation is a state law claim, for which state law applies. *Clark v. State Farm Mutual*

*Auto. Ins. Co.*, 433 F.3d 703, 709 (10th Cir. 2005); *Shrader v. Beann*, 503 Fed App'x 650, 654

(10th Cir. Nov. 29, 2012). The elements of a libel *per se* claim under Colorado law are: i)

defendant published; ii) a defamatory statement; iii) to a third party; iv) with fault amounting to

negligent disregard for the accuracy of the statement; and v) the plaintiff incurred special

damages or the statement is actionable irrespective of special damages. *Lawson v. Stow,* 327 P.3d

340, 346 (Colo. App. 2014); *see also Denver Pub. Co. v. Bueno*, 54 P.3d 893, 899 at n. 8 (Colo.

2002); *see also Cross v. Receivables Mgmt. Solutions, Inc.*, Case No. 04-cv-01493-MSK-PAC, 2006 WL 446083, *5 (D. Colo. Feb. 21, 2006).

Ms. Harrison argues that Ms. Preeson cannot establish that: (i) the statements were defamatory (as opposed to matters of pure opinion) and verifiably false; (ii) the statements were actually published; and (iii) she suffered special damages or that the statement is actionable independent of any damages.  The Court takes these issues in turn.

(a)  Defamatory character

A statement is defamatory if it prejudices the plaintiff in the eyes of a respectable minority of the community, that is, it impugns the plaintiffs' reputation. *Tonnessen v. Denver Pub. Co.*, 5 P.3d 959, 963 (Colo. App. 2000). Not all negative statements about an individual are actionable; statements of opinions are protected expressions and cannot form the basis of a defamation claim. *See TMJ Implants, Inc. v. Aetna, Inc.*, 498 F.3d 1175, 1183 (10th Cir. 2007). There is no "wholesale defamation exception" for all statements containing an opinion. *Id.* (*citing Milkovich v. Lorain Journal Co.*, 497 U.S. 1 (1990)). Instead, only statements of "pure" opinion – those that do not contain provably false factual connotations or which cannot reasonably be interpreted as stating actual facts about an individual – are protected. *Zueger v. Goss*, 343 P.3d 1028, 1034 (Colo. App. 2014); *Keohane v. Stewart*, 882 P.2d. 1293, 1299 (Colo. 1994).

The Colorado Supreme Court decision, *Burns v. McGraw-Hill Broadcasting Co.*, 659 P.2d 1351 (Colo. 1983), coupled with the more recent United States Supreme Court decision, *Milkovich*, provide the framework to determine whether a statement is defamatory or a protected opinion. *See Keohane*, 882 P.2d at 1299. The Court first determines whether the statement contains, or alludes to, a verifiable fact about the plaintiff (i.e. an assertion that is "sufficiently

factual to be susceptible of being proved false"). *Milkovich*, 497 U.S. at 21; *Bucher v. Roberts*, 595 P.2d 239, 241 (Colo. 1979). A "deductive opinion" – one that indicates (implicitly or explicitly) that it is based on the existence of an undisclosed factual predicate – can support a cause of action in defamation. *Burns*, 659 P.2d at 1360; *Jefferson Cnty Sch. Dist. No. R-1 v. Moody's Investor's Servs., Inc.*, 175 F.3d 848, 853 (10th Cir. 1999). On the other hand, an "evaluative opinion" – one formed on the basis of an individual's intrinsic perceptions which are not provably true or false – is not defamatory. *Id.*

Second, the Court determines whether reasonable people would conclude that the assertion is one of fact. *Id.*; *NBC Subsidiary (KCNC–TV), Inc. v. Living Will Ctr.*, 879 P.2d 6, 11 (Colo. 1994). To do so, the Court examines factors including 1) how the assertion is phrased; 2) the context of the statement; and 3) circumstances surrounding the assertion such as the medium through which the information is disseminated and the audience to whom it is directed. *Zueger*, 343 P.3d at 1034; *Keohane*, 882 P.2d at 1299. If an average listener would perceive a comment as an assertion of fact, due to the specificity of the language used or other factors, it may sufficiently sustain a defamation action. *Burns*, 659 P.2d at 1360. Contrarily, a statement that is "replete with speculative" language, stated in a context in which it was obvious that the speaker was stating her opinion, is not that which a reasonable reader would presume to be a factual declaration. *See Jefferson Cnty. Sch. Dist*, 175 F.3d at 853.

Independent of this two-part inquiry, there may be statements where, "due to the subject matter involved, there is simply no objective evidence that could prove" their truth or falsity. *Jefferson Cnty. Sch. Dist.*, 175 F.3d at 854; *see Living Will Center*, 879 P.2d at 13-15. For example, a statement that a product or service provided is overpriced is not verifiable, because worth is "an inherently subjective measure which turns on myriad considerations and necessarily

. . . personal judgments." *Jefferson Cnty. Sch. Dist.*, 175 F.3d at 854 (*citing James v. San Jose Mercury News, Inc.*, 17 Cal.App.4th 1 (1993)).

Whether a statement is defamatory is a question of law to be determined by the Court. *Milkovich*, 497 U.S. at 17; *Zueger*, 343 P.3d at 1034. Where, as here, several distinct statements are challenged, the Court analyzes each independently. *Keohane*, 882 P.2d at 1300.

Ms. Preeson's response to Ms. Harrison's motion paraphrases nine statements she contests as defamatory. The Court will not belabor this analysis by reciting each statement and painstakingly examining it. Rather, it is sufficient to state that the Court finds that many of the claimed statements – that Ms. Preeson was "unfriendly" with prior co-workers or "resented" them, that she was "quick to complain" about things, that she "would not be a good representative" – are statement of pure opinion. The Court finds that, at best, Ms. Preeson has identified five statements that could be said to be factual in nature: (i) that she "exaggerated" her prior work experience at a previous employer; (ii) that she "did not know [how to process] CHP+ or Adult Medicaid [claims]"; (iii) that she would "find ways to get patients on [Medicaid] and would eliminate information in order to do so," suggesting that she engaged in malfeasance in her previous job; (iv) that she "did not stick to strict [Health Care Policy and Financing] guidelines"; and (v) that she "does not have a positive reputation at [the Health Care Policy and Financing Department]."

The determination of the truth of an alleged defamatory statement is a question of fact. *Gomba v. McLaughlin*, 504 P.2d 337, 339 (Colo. 1972). Accordingly, to determine this question on summary judgment, Ms. Harrison must show that there is no genuine dispute of material fact that the statements included in her email were true. Jurisdictions are divided regarding which party – the plaintiff or the defendant – bears the burden to show that challenged statements are

false, and Colorado courts recognize this uncertainty. *See McIntyre*, 194 P.3d at 527-28 ("Case law is somewhat unclear whether, or in what circumstances, a plaintiff must prove that the alleged defamatory statement is false or whether the truth of the statement is an affirmative defense to be proved by the defendant."). In *Gordon v. Boyles*, 99 P.3d 75, 81 (Colo. App. 2004), the Colorado Court of Appeals concluded that truth of a statement is a "defense" to defamation, and a defendant must "show substantial [not absolute] truth, that is, 'the substance, the gist, the sting of the matter is true.'" Other Colorado cases have recognized that generally, truth is an affirmative defense to a defamation claim, and, therefore, it is the defendant's, not the plaintiff's, initial burden to show that the statement is false. *See Churchey v. Adolph Coors Co*, 759 P.2d 1336 (Colo. 1988); *Gomba*, 504 P.2d 337.

However, there is some debate as to whether, in the absence of a qualified privilege, a plaintiff in a private defamation action may be required to demonstrate, as part of a *prima facie* case, that the statement was false. *See Williams v. Boyle*, 72 P.3d 392, 401 (Colo. App. 2003), *as modified on denial of reh'g* (Feb. 6, 2003). More recently, the Colorado Court of Appeals determined that a "heightened burden" is placed on the plaintiff only if the defamatory statement relates to a matter of public concern or if the plaintiff is a public figure." *Shoen v. Shoen*, 292 P.3d 1224, 1228 (Colo. App. 2012). The *Shoen* opinion implied that in a case involving a public figure or matter, a plaintiff would be required to show the falsity of a statement. But, in a purely private matter, the defamation law is more narrowly designed to protect individual "dignity and worth." *Id.* Supreme Court jurisprudence follows this reasoning. For example, in *Philadelphia Newspapers, Inc. v. Hepps*, 475 U.S. 767, 775-76 (1986), the Supreme Court noted that the "common law rule" requires a defendant to show the truth of his statement; only where a plaintiff is a public figure does the plaintiff bear the burden to show falsity.

Ms. Harrison contends that Ms. Preeson has not offered sufficient evidence to meet her burden to prove that the five listed statements are false. However, due to the uncertainty of the law, and the presumption in favor of a trial over summary judgment where there are disputes of material fact, the Court will grant summary judgment only as to those statements that Ms. Harrison can show are true beyond a material dispute. Here, Ms. Harrison has not come forward with specific evidence demonstrating the truth of any of the five actionable statements.

(b) Publication

Ms. Harrison argues that these statements were not actually published, because one of the two recipients of her e-mail did not remember reading the statements and the other recipient did not disseminate the statements. This argument is without merit. A statement is sufficiently published if it is communicated, whether intentionally or negligently, to "one other than the person defamed." *Card v. Blakeslee*, 937 P.2d 846, 850 (Colo. 1996); *see* Restatement (Second) of Torts § 577; *see also Card v. Blakeslee*, 937 P.2d 846, 850 (Colo. App. 1996); *Signer v. Pimkova*, Case No. 05-cv-02039-REB-MJW, 2007 WL 4442327, *3 (D. Colo. Dec. 14, 2007) (finding defamatory statement in an email distributed to four of plaintiff's clients constitutes sufficient publication). A published statement need only damage the plaintiff's reputation in the eye of a single member of a community. *See* Restatement (Second) of Torts § 577. At least two others received Ms. Harrison's email containing the statements, and therefore it was sufficiently published.

(c) Injury

Whether a statement is defamatory per se is a matter of law for the Court to determine. *Kleier Advertising, Inc. v. Premier Pontiac, Inc.*, 921 F.3d 1036, 1044 (10th Cir. 1990); *Interstate Detective Bureau, Inc. v. Denver Post, Inc.*, 484 P.2d 131, 133 (Colo. App. 1971).

Under Colorado law, a statement is defamatory *per se* if it accuses the plaintiff of a crime or of conduct that is "incompatible with [the plaintiff's] business, trade, profession, or office." *Denver Publishing Co. v. Bueno*, 54 P.3d 893, 898 (Colo. 2002); *Keohane v. Wilkerson*, 859 P.2d 291, 301 (Colo. App. 1993); *Signer*, 2007 WL 4442327, *4. Colorado Courts interpret the requirement that a statement be incompatible with an individual's profession broadly. For example, in *Pittman v. Larson Distributing Co.*, 724 P.2d 1379, 1387 (Colo. App. 1986), the Colorado Court of Appeals found that statements that an employee "spent too much time in the office and on the telephone," and was fired because he "wasn't doing a good job" were defamatory *per se*.  Similarly, in *Meehan v. Amax Oil & Gas, Inc.*, 796 F. Supp. 461, 466 (D. Colo. 1992), the court determined that statements that the plaintiff "did a bad job or terrible job" in credit and collection tasks was slanderous *per se*, and therefore plaintiff did not need to prove special damages.

Ms. Harrison contends that Ms. Preeson's libel *per se* claim fails because she has not pled damages and she cannot show the purported defamatory statement is actionable independent of monetary damages.  Specifically, she argues that the statements were not so egregious as to be *incompatible* with Ms. Preeson's profession. This argument was previously examined by the Magistrate Judge in an Order (# **55**) on Ms. Preeson's Motion to Amend the Complaint (# **43**) at the pleadings stage. The Magistrate Judge rejected this argument, and Ms. Harrison has not presented the Court with new legal argument regarding her contention that the statements do not, as a matter of law, sufficiently impugn Ms. Preeson's professional ability. Instead, Ms. Harrison attempts to submit additional evidence showing that the statements made about Ms. Preeson did not directly cause her to be denied a promotion or lose her job. But a defamation *per se* claim does not require the existence of adverse consequences or actual damages for a plaintiff.

*McIntyre*, 194 P.3d at 523.[6] Rather, the issue is whether, facially, the statements *could* sufficiently undermine a plaintiff's professional reputation, and here, there is some evidence that they would.

Accordingly, the Court grants in part and denies in part Ms. Harrison's Motion for Summary Judgment.  Ms. Preeson's defamation claim will proceed to trial as to the five statements identified above.

### D.  Motion to Restrict

Ms. Preeson's Motion to Restrict requests that public access to Exhibit PP (**# 52-1**) to Ms. Preeson's Motion for Summary Judgment be restricted.  The Defendants do not object.

Exhibit PP consists of several pages of excerpts from the deposition of Parkview employee Jacinta Ramos. Ms. Ramos testified that she suffered health problems requiring her to take FMLA leave while employed at Parkview. Ms. Preeson states that restriction is appropriate because 1) the parties entered into a protective order agreeing to keep that deposition confidential; 2) the Defendants do not object; and 3) because the document contains "sensitive" and "personal medical information," public access would violate the deponent's right to privacy.

There is a well-established common-law right of access to judicial records. *See Nixon v. Warner Commc'ns, Inc.*, 435 U.S. 589, 597 (1978). This right is premised upon the idea that the public must retain the ability to evaluate a court's decision-making process and ensure that it is promoting justice by acting as a neutral arbitrator. *See United States v. McVeigh*, 119 F.3d 806, 814 (10th Cir. 1997); *see also United States v. Amodeo*, 71 F.3d 1044, 1048 (2d Cir. 1995) ("The presumption of access is based on the need for federal courts . . . to have a measure of accountability and for the public to have confidence in the administration of justice.").

---

[6]     Granted, if Ms. Preeson cannot prove any actual damages resulting from a defamation claim at trial, she will be entitled only to nominal damages. *McIntyre*, 194 P.3d at 523.

Accordingly, there is a strong presumption that documents filed in a lawsuit that are pertinent to

a judicial determination should be freely available to the public. *Colony Ins. Co. v. Burke*, 68

F.2d 1222, 1242 (10th Cir. 2012). Access to court filings may, however, be restricted when the

public's right of access is outweighed by interests favoring non-disclosure. *See McVeigh*, 119

F.3d at 811. A party seeking to restrict public access bears the burden to demonstrate compelling

reasons justifying restriction. *See Eugene S. v. Horizon Blue Cross Blue Shield of NJ*, 663 Fl.3d

1124, 1135-36 (10th Cir. 2011); *see also McVeigh*, 119 F.3d at 814.

Motions to restrict (whether unopposed or contested) are governed by D.C.Colo.LCivR

7.2.  A party shall file a motion with the Court that: (1) identifies the document for which

restriction is sought; (2) addresses the interest to be protected and why such interest outweighs

the presumption of public access; (3) identifies a clearly defined and serious injury that would

result if access is not restricted; and (4) explains why no alternative to restriction will suffice.

*See* D.C.Colo.LCivR 7.2. That is, the movant shall articulate a real and substantial interest that

justifies depriving the public of access to documents that informed the court's decision-making

process. *See Helm v. Kansas*, 656 F.3d 1277, 1292 (10th Cir. 2011). The fact that the parties

agree or that a Stipulated Protective Order is in place does not dictate the Court's decision or

change its analysis, as the right of access belongs to the public who, necessarily, was not a party

to such an agreement. *See* D.C.Colo.LCivR 7.2(c)(2).

Ms. Preeson's Motion to Restrict does not comply with the requirements of

D.C.Colo.LCivR 7.2. Though the Motion identifies a general private interest, it does not explain

why this interest outweighs the presumption of public access to information. The Motion further

fails to point to any serious and imminent injury the deponent might suffer as a result of

disclosure. Nor does it address any alternatives to full restriction. The Motion to Restrict is therefore denied.

## CONCLUSION

For the foregoing reasons, the Defendants' Motion for Summary Judgment (**# 48**) is **GRANTED IN PART**, insofar as they are entitled to summary judgment on Ms. Preeson's claims for FMLA interference, disability discrimination relating to promotions, retaliation in violation of the ADA, and claims under CADA, and **DENIED IN PART**, insofar as Ms. Preeson's claims for FMLA retaliation (relating to her failure to be promoted to supervisor and her termination) and ADA discrimination (relating to her termination) will proceed to trial. Ms. Harrison's Second Motion for Summary Judgment (**# 60**) is **GRANTED IN PART and DENIED IN PART**, in that Ms. Preeson's defamation claim will proceed to trial as to the five statements set forth herein.  Ms. Preeson's Motion to Restrict (**# 52**) is **DENIED**, and the Clerk of Court shall lift the temporary restriction on Docket **# 52-1**. The parties shall begin preparation of a Proposed Pretrial Order consistent with the instructions in Docket # 23, and within 7 days of this Order, the parties shall jointly contact chambers to schedule a Pretrial Conference.

DATED this 30th day of March, 2017.

**BY THE COURT:**

*Marcia S. Krieger*

Marcia S. Krieger
United States District Court